UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WHISTLEBLOWER AID<br>1250 Connecticut Avenue, N.W.<br>Suite 700<br>Washington, D.C. 20036<br><br>    Plaintiff<br><br>    v.<br><br>DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001<br><br>    Defendant. | Civil Action No. 21-_____ |

## COMPLAINT

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., as amended, to seek disclosure of agency records improperly withheld from the Plaintiff Whistleblower Aid and Mark G. McConnell by the Defendant Department of Justice (as well as its subordinate entities).

## JURISDICTION

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2. Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Whistleblower Aid ("WBA") is a non-profit law firm that provides pro bono representation to lawful whistleblowers. WBA represents Mark McConnell, a senior

GS-15 attorney who serves in the Organized Crime and Drug Enforcement Task Forces ("OCDETF") component organization of the Defendant U.S. Department of Justice. For purposes of FOIA, WBA seeks designation as a representative of the news media.

4. Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552(f), and is in possession and/or control of the records requested by the plaintiff that are the subject of this action. DOJ controls – and consequently serves as the proper party defendant for litigation purposes for – the Federal Bureau of Investigation ("FBI").

## FACTUAL BACKGROUND

5. This FOIA lawsuit seeks disclosure of U.S. Government records primarily created by the FBI's Criminal Investigation Division ("CID") that relate to a whistleblower's efforts to reveal a pattern of conduct involving falsified intelligence reports generated by the FBI and the Central Intelligence Agency ("CIA") that has led to unlawful retaliation against him. The story these documents reveal was described in the November 9, 2020, issue of *New Yorker Magazine* in an article by Ronan Farrow entitled "How a CIA Cover-Up Targeted a Whistleblower" at *https://www.newyorker.com/magazine/2020/11/09/how-a-cia-coverup-targeted-a-whistle-blower* (last accessed June 11, 2021).

6. In July 2017, Mr. McConnell was detailed by the OCDETF Executive Office to work at the Joint Interagency Task Force South ("JIATFS") at the request of JIATFS leadership. The primary reasons for detailing Mr. McConnell to JIATFS were: to inject an agency-agnostic prosecutor perspective into the federal law enforcement agency interactions at JIATFS to try and smooth out unproductive competitive interagency law enforcement behaviors; and to help JIATFS build a transparent and coordinated targeting

process to improve cooperation and effectiveness between federal law enforcement agencies, U.S. intelligence agencies, and U.S. federal prosecutors to better enable JIATFS to use its limited interdiction assets to target the most significant maritime drug transportation events. Mr. McConnell's detail to JIATFS was the first time that a DOJ attorney had ever worked in the environment at JIATFS and had the opportunity to evaluate the programs that are in place at JIATFS to support federal law enforcement investigations that target international drug trafficking organizations.

7. Shortly after Mr. McConnell started at JIATFS, he was approached by a Drug Enforcement Administration ("DEA") Special Agent who was assigned to JIATFS and who requested help with a targeting case in which the DEA Special Agent believed that the FBI and CIA had submitted false and deceptive intelligence reports, all of which were classified as SECRET, in the form of critical movement alerts ("CMAs") into a JIATFS intelligence fusion and interdiction targeting database called "Helios." The agent believed these CMA entries were introduced to influence JIATFS targeting actions to favor targets submitted by the FBI over targets submitted by other federal law enforcement agencies. These CMAs contained precise targeting information that was attributed to specific FBI personnel and to a supposedly classified method of collection that was under the control of a law enforcement agency, but the CMAs did not appear to be connected to any actual ongoing FBI criminal investigation. All other federal law enforcement-based CMAs in Helios were all marked as being UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE in compliance with Helios data entry rules and the nature of law enforcement controlled collection methods.

8. After Mr. McConnell reviewed all of the Helios CMA entries in the case identified by the DEA Special Agent, Mr. McConnell approached the senior FBI Special Agent at JIATFS and inquired as to whether the CMAs in question were improperly classified and were falsely attributed to FBI personnel in order to mask the fact that the CIA was the true source of the information in the CMAs. The senior FBI Special Agent at JIATFS advised Mr. McConnell that the CMAs in question related to targets of mutual interest to the CIA and the FBI, that the CMAs were an appropriate way for the FBI to start up new investigations based upon a partnership with the CIA, and that any conflicts between the new FBI investigations and ongoing investigations by other federal law enforcement agencies that had provided CMA intelligence reports on the same targets could be worked out later in the field. Mr. McConnell then told the senior FBI Special Agent that it was improper for the FBI to use classified information from another government agency in CMAs that purported to come solely from FBI law enforcement sources. Mr. McConnell further advised that corrective action was needed immediately because the improper masking of the CIA's role in federal criminal prosecutions could cause federal prosecutors who did not know about the CIA's involvement to fail to meet their affirmative discovery disclosure obligations. Failing in those obligations could result in dismissal of federal criminal cases and potentially result in professional discipline actions against individual prosecutors. The FBI Special Agent did not agree with Mr. McConnell's assessment of the problems related to the deceptive CMAs.

9. After the conversation with the senior FBI Special Agent, Mr. McConnell reviewed all of the FBI CMAs contained in the Helios database that appeared similar to the ones in the case raised by the DEA Special Agent and found dozens of apparently

deceptive FBI CMA entries. Because of the significant issues raised by the intentionally falsified FBI CMAs, including possible criminal violation of 18 U.S.C. § 371 concerning a conspiracy to defraud an agency of the United States, Mr. McConnell felt compelled to raise this issue up to his OCDETF chain of command and, despite the support of his OCDETF supervisory chain, that is when his problems truly began.

10. On or about March 2, 2018, Assistant U.S. Attorney ("AUSA") Dick Getchell requested a call with Mr. McConnell about a maritime narcotics interdiction case that involved suspicious FBI CMAs and where the FBI had refused to divulge the source of the investigative information contained in the CMAs to AUSA Getchell. He asked if Mr. McConnell had any information as to the actual source of investigative information contained in the FBI CMAs. Mr. McConnell then related to AUSA Getchell the full story regarding these suspect CMAs; particularly that the deceptive CMAs appeared to be an FBI/CIA intelligence laundering scheme where CIA information was being intentionally falsely attributed to FBI sources in JIATFS CMAs in order to influence JIATFS targeting and DOJ case assignment decisions, and that FBI personnel had refused to answer questions from the JIATFS intelligence and operations staffs as to the true source of information contained in the purported FBI CMAs.

11. In November 2018, Mr. McConnell learned that OCDETF regional authorities in Miami had given approval to an FBI-led law enforcement operation within the Southern District of Florida on the basis of four maritime interdiction prosecutions that resulted from deceptive FBI/CIA CMAs. The fact that the CIA had actually provided information contained in CMAs was never revealed to the OCDETF prosecutors who approved the FBI-led operation in the Southern District of Florida. This served as confirmation to Mr.

McConnell, and his supervisors at the OCDETF Executive Office, that the fraudulent CMAs were deceptively influencing JIATFS and DOJ actions.

12. Later in November and December 2018, Mr. McConnell brought information about the CMAs to the attention of the JIATFS Staff Judge Advocate (command lawyer), to the Security and Intelligence Director (J2) at JIATFS (who had authority over Helios and the CMA process), as well as the Director and Deputy Director of OCDETF. In order to best present the legal and policy concerns created by the deceptive FBI CMAs, and only after securing the approval of the JIATFS Intelligence and Security Director (J2), Mr. McConnell created a properly classified presentation that preserved examples of the deceptive FBI CMAs in multiple cases. Mr. McConnell lawfully disseminated the presentation through secure channels to various individuals within the OCDETF Executive Office, the FBI and JIATFS staff.

13. Upon information and belief, on January 11, 2019, a meeting was held at CIA headquarters where Mr. McConnell's classified presentation was discussed in detail. CIA representatives falsely alleged that the presentation that was marked as SECRET//NOFORN, which was the classification level of the CMAs from the Helios database that were contained in the presentation, involved a spillage of classified CIA information that was contained in the JIATFS database even though the CMAs did not purport to contain CIA information. For his role in reporting the issue, some CIA personnel in attendance pressed for consequences for Mr. McConnell.

14. On January 22, 2019, after making lawful protected disclosures up his chain of command and within JIATFS, Mr. McConnell learned that his CMA presentation was being treated as an improper spillage of CIA CMA information and that it was ordered

removed from classified JIATFS systems. As the JIATFS Security Manager put it to Mr. McConnell, the presentation was being removed as part of a "gentleman's agreement with the Agency."

15. On January 23, 2019, Mr. McConnell filed a formal whistleblower complaint with the Department of Defense's Office of the Inspector General's classified hotline and attached his classified presentation. He filed subsequent complaints with the DOJ and the Intelligence Community's Offices of Inspector General as well. Knowing he would soon be subject to the ire of the CIA and likely to face retaliation, Mr. McConnell, while following classified information procedures, preserved backup printed copies of the Helios images he had sent to the hotline. Later that day, security officers deleted the electronic version of the evidence presentation from his computer.

16. On January 29, 2019, OCDETF's Director requested a meeting at DOJ's Main Headquarters in Washington, D.C. Mr. McConnell was present along with Associate Deputy Attorney General ("ADAG") Andrew Goldsmith, ADAG Patrick Hovakimian, OCDETF's Director and Deputy Director, and FBI Special Agents Brian Vorndran and Kristi Johnson. At the meeting ADAG Goldsmith reviewed the electronic evidence presentation created by Mr. McConnell that showed the deceptive FBI CMAs; ADAG Goldsmith then prescribed that FBI CID conduct a fact-finding investigation in conjunction with OCDETF personnel to determine whether JIATFS FBI agents had intentionally submitted false CMAs in the Helios database.

17. In response to ADAG Goldsmith's instruction, upon information and belief, FBI Special Agents Vorndran and Johnson undertook an investigation without involving OCDETF personnel as prescribed by ADAG Goldsmith, in spite of requests from

OCDETF leadership to participate, and they subsequently produced a corrective action report related to the FBI CMAs that was never shown to any OCDETF personnel.

18. On February 22, 2019, DOJ Inspector General ("IG") Special Agent Joel Veiguela contacted Mr. McConnell and set up an interview at JIATFS for February 26, 2019 to discuss Mr. McConnell's disclosures. On February 24, 2019, Mr. McConnell notified the JIATFS Director that he had filed official complaints with the Inspector General for the Department of Defense, the Inspector General for the Department of Justice, and the Inspector General for the Intelligence Community ("the IG entities") and further advised the JIATFS Director that his disclosures to the IG entities specifically alleged that the conduct of FBI and CIA personnel in creating deceptive CMAs that were inserted into the JIATFS Helios database violated the criminal provisions of 18 U.S.C. § 371, conspiracy to defraud an agency of the United States.

19. On February 26, 2019, DOJ IG Special Agents Joel Veiguela and Matthew McCloskey interviewed Mr. McConnell under oath at JIATFS over a period of approximately seven hours. As part of that interview, Mr. McConnell provided the DOJ IG agents with a hard copy of the electronic CMA evidence presentation. During the course of the DOJ interview, the CIA principal representative at JIATFS personally complained to members of the JIATFS senior staff, including the JIATFS J2, that Mr. McConnell was improperly meeting with the DOJ IG Special Agents at JIATFS.

20. On March 4, 2019, Mr. McConnell's local access to JIATFS facilities and classified information systems was suspended by the JIATFS Director based on CIA's allegations that he improperly disclosed classified information related to the FBI/CIA CMAs. As a result, he was escorted out the front door of the JIATFS command building

in a highly visible manner. This action, however, was nothing but unlawful retaliation for Mr. McConnell's whistleblowing activities.

21. On or about March 2019, FBI Special Agents Vorndran and Johnson made false statements to ADAG Hovakimian about FBI's alleged corrective action regarding the fraudulent CMAs. Their statements claimed that new corrected language that removed the false attribution of the CMA information to FBI sources was being used in FBI CMAs as of December 7, 2018. However, between December 10, 2018, and December 17, 2018, the FBI CMAs that were submitted to the Helios database by the FBI continued to inaccurately attribute their sources of information. In fact, Mr. McConnell's classified presentation specifically identified a CMA from December 17, 2018, that contradicted their assertion, and both Special Agents Vorndran and Johnson were aware of this fact.

22. A few weeks after Mr. McConnell was ejected from JIATFS, CIA Director Gina Haspel visited the facility. Director Haspel was briefed on Mr. McConnell's involvement blowing the whistle about the deceptive FBI/CIA CMA scheme. Upon information and belief, Director Haspel expressed the need for "repercussions" for Mr. McConnell, because of his disclosure.

23. In the following months, Mr. McConnell's appeal of his suspension of access to JIATFS facilities and classified information was ignored and discussion about his future assignments ground to a halt.

24. On or about January 31, 2020, Mr. McConnell, accompanied by his undersigned attorneys Mark S. Zaid and John Tye, met with a representative of the DOJ's Office of Inspector General ("DOJ IG") and learned of the existence of the FBI's corrective action report, which was identified as being approximately thirty-five pages long. In a

subsequent conversation between the same DOJ IG representative and Mr. McConnell's attorneys, the DOJ IG representative stated that he had been told by FBI personnel that the FBI had called the OCDETF Director concerning the corrective action report, that the FBI had not allowed the OCDETF Director to read the full report, and that FBI personnel had read certain quotes from the corrective action report to the OCDETF Director and asked for the OCDETF Director's agreement with the content of the quotes.

25. The aforementioned *New Yorker* article quoted a DOJ spokesperson that ADAG Goldsmith reviewed the matter and "made recommendations to federal law-enforcement officials and prosecutors, which resulted in a careful review of both past cases and current practice.")." *https://www.newyorker.com/magazine/2020/11/09/how-a-cia-coverup-targeted-a-whistle-blower* (last accessed June 11, 2021).

26. This FOIA lawsuit seeks disclosure of FBI's corrective action report.

## COUNT ONE

27. Plaintiff repeats and realleges paragraphs 7 through 25 above.

28. By letter dated February 13, 2020, Plaintiff submitted to FBI a FOIA request that sought a copy of FBI's corrective action report.

29. On February 25, 2020, FBI assigned the request number 1460637-000 and stated it was "...unable to identify records responsive to your request."

30. On March 23, 2020, Plaintiff administratively appealed the decision, which was assigned Appeal No. A-2020-00510.

31. By letter dated December 9, 2020, DOJ affirmed the FBI decision that it could not locate any responsive record.

32. Plaintiff has exhausted all required administrative remedies.

WHEREFORE, Plaintiff Whistleblower Aid prays that this Court:

(1) Orders the Defendant to disclose non-exempt copies of the requested records in their entirety and make copies promptly available to the Plaintiff;

(2) Award reasonable costs and attorney's fees as provided in 5 U.S.C. § 552 (a)(4)(E), 5 U.S.C. § 552a(g)(3)B), and/or 28 U.S.C. § 2412 (d);

(3) expedite this action in every way pursuant to 28 U.S.C. § 1657 (a); and,

(4) grant such other relief as the Court may deem just and proper.

Date:   June 14, 2021

        Respectfully submitted,

        /s/ Mark S. Zaid

        _____

        Mark S. Zaid, Esq.
        D.C. Bar #440532
        Bradley P. Moss, Esq.
        D.C. Bar #975905
        Andrew P. Bakaj, Esq.
        D.C. Bar #978658
        Mark S. Zaid, P.C.
        1250 Connecticut Avenue, N.W.
        Suite 700
        Washington, D.C. 20036
        (202) 454-2809
        (202) 330-5610 fax
        Mark@MarkZaid.com
        Brad@MarkZaid.com
        Andrew@MarkZaid.com

        Attorneys for the Plaintiff